DISTRICT COURT.                                    MAY 4, 1861.

CRIMINAL LAW.

## THE UNITED STATES v. CHARLES A. GREINER.

Shortly before the late revolutionary secession of Georgia, a volunteer military company in her service, by order of her governor, took possession of a fort within her limits, over which jurisdiction had been ceded by her to the United States, and garrisoned it until her ordinance of secession was promulgated, when, without having encountered any hostile resistance, they left it in the possession of her government. A member of this company, who had participated in the capture and detention of the fort, afterwards visited Pennsylvania at a period of threatened, if not actual, hostilities between the confederated States, of which Georgia was one, and the United States. He was arrested in Pennsylvania under a charge of treason.

1. It was held that if the courts of the United States for Georgia had been open, or if there had been a reasonable 'probability that they would soon be able to exercise their jurisdiction, the accused should, upon the charge of treason, have been committed, under the 33d Section of the judiciary act of 24th September, 1789, to stand his trial in the Circuit Court of the United States for the Southern District of Georgia, which court alone could have jurisdiction of the case. This act of Congress would then have required that a warrant should be seasonably issued for his removal to that district by the marshal. Such a warrant of removal was not asked for on behalf of the United States; and it was admitted that their courts for Georgia were not open, and were not likely to be able to exercise their jurisdiction within any definable period. Under such circumstances, the Constitution and laws of the United States gave no authority to commit the accused, or to require him to give bail to answer the charge of treason, at an uncertain future day in Georgia.

2. But though his immediate purpose in visiting Pennsylvania was apparently neither belligerent nor treasonable, the motive of his visit was, on account of his prior hostile relations to the United States, liable to just suspicion. He was required, therefore, to give security to keep the peace, and be of good behavior in all cases arising under the Constitution and laws of the United States.

3. When a body, large or small, of armed men is mustered in military array for a treasonable purpose, every step which any one of them takes, by marching or otherwise, in part execution of this purpose, is an overt act of treason in levying war.

4. Their occupation of a fortress, in order to take it from the dominion of a government to which they owe allegiance, is treason in every one of them concerned in the capture, or subsequent detention of the post, though they may encounter no hostile resistance in the capture or the detention.

5. A private soldier, or subordinate officer, serving under the command of a military superior, cannot excuse a treasonable act on the ground of compulsion, unless he was forced, under a personal fear of death, into the service, and quitted it as soon as he could.

6. This doctrine applies wherever, and so long as, the duty of allegiance to an existing government remains unimpaired. Though a revolution is impending, the allegiance continues to be due, so long, at least, as the courts of justice of the government are open to maintain its peace, and afford the citizen that protection which is the foundation of his duty of allegiance.

7. The accused owed a twofold allegiance, to the United States, and to the State of Georgia. His duty of allegiance to the United States was co-extensive with the jurisdiction of their government, and was, to this extent, independent of, and paramount to, his duty of allegiance to the State. It continued to be thus paramount so long, at least, as the courts of the United States could exercise their jurisdiction within the state. Though these courts have been closed since the capture of the fort, there was, at its date, no such conflicting enforced allegiance to the state, as made him a public enemy of the United States, in contradistinction to a traitor.

8. The provision of the Constitution that no person shall be convicted of treason unless on the testimony of two witnesses to the same overt act, or on confession in open court, is inapplicable to preliminary hearings and commitments.

## STATEMENT.

CHARLES A. GREINER was brought, under a charge of treason, before a commissioner of the United States. At the suggestion of the commissioner, the examination, on account of the importance of the case, was taken before the District Judge of the United States. At the close of the examination, the United States District Attorney, GEORGE A. COFFEY, Esq., moved that the defendant be committed or held for trial at the next actual session of the U. S. Circuit Court for the Southern District of Georgia. The District Attorney admitted that the United States Courts did not now sit, nor their process actually run, in Georgia; but he argued at length that the judge was bound to presume that those courts would sit in Georgia within a reasonable period; and that this was at present a legal presumption, in view of the avowed purpose of the government to re-establish its authority there. After hearing the evidence, the learned District Judge delivered the following opinion:

## CADWALADER, J.

The questions in this case are more important than difficult. On the 2d of January last, an artillery company of the State of Georgia, mustered in military array, took Fort Pulaski, in that state, from the possession of the United States, without encountering any forcible resistance. They garrisoned the post for some time, and left it in the possession of the government of the state. The accused, a native of Philadelphia, where he has many connections, resides in Georgia. He was a member of this artillery company when it occupied the fort, and, for aught that appears, may still be one of its members. He was not its commander. Whether he had any rank in it, or was only a private soldier, does not appear, and is, I think, unimportant. He is charged with treason in levying war against the United States. The overt act alleged is that he participated,

as one of this military company, in the capture of the fort, and in its detention until it was handed over to the permanent occupation of the authorities of the state.

The primary question is whether, if his guilt has been sufficiently proved, I can commit him for trial, detain him in custody, or hold him to bail to answer the charge. The objection to my doing so is, that the offence was committed in the State of Georgia, where a court of the United States cannot, at present, be held, and where, as the District Attorney admits, a *speedy* trial cannot be had. The truth of this admission is of public notoriety.

The Constitution of the United States provides that in all criminal prosecutions the accused shall enjoy the right to a *speedy* trial by a jury of the *State and district* wherein the crime shall have been committed. The only statute which, if the courts of the United States for the State of Georgia were open, would authorize me to do more than hold this party to security of the peace and for good behavior, is the 33d Section of the judiciary act of the 24th September, 1789. That section, after authorizing commitments, etc., for trial before any court of the United States having "cognizance of the offence," enacts that if the commitment is in a district other than that in which the offence is to be tried, it shall be the duty of the judge of the district where the delinquent is imprisoned, *seasonably* to issue, and of the marshal of the same district to execute, a warrant for the removal of the offender to the district in which the trial is to be had. The District Attorney of the United States does not ask me to issue such a warrant for this party's removal to Georgia for trial. Therefore I can do nothing under this act of Congress. It does not authorize me to detain him in custody to abide the ultimate result of possible future hostilities in Georgia, or to hold him to bail for trial in a court there, of which the sessions have been interrupted, and are indefinitely postponed.

The next question is, whether I should, under the act of 16th July, 1798, require this party to give security to keep the peace and be of good behavior in all cases arising under the Consti-

tution and laws of the United States. His counsel suggests that he was acting under the compulsion of military orders from the Governor of Georgia, which the law of the State bound him to obey; that the fort, when taken, was not so garrisoned or occupied that an array of military force was required for its capture; that it was taken without actual resistance on the part of the person or persons who had occupied it for the United States; that the period was one at which motives of hostility against the United States are not imputable to the Governor of Georgia, or to those who acted under his orders; that the capture and subsequent detention of the fort may have been to prevent its riotous occupation or destruction by a mob; and that the accused party, therefore, was not guilty of levying war against the United States, or of any other offence against their laws. If these views are incorrect, if either the capture or the detention of the post was treasonable, there can, I think, be no dispute that security of the peace and for good behavior should be required.

In explanation of Mr. Greiner's visit to Philadelphia, it has been shown that his wife and child have been here from the commencement of last winter, at a boarding house, at which he arrived a few days ago, and that he has lived there openly, with them, from that time until his arrest on Tuesday last. The district attorney states that he has made sufficient inquiry, and asks no time for further inquiry, into the circumstances of this visit, or as to occurrences during Mr. Greiner's sojourn here. He appears, nevertheless, to have declared his intention to return to Georgia, where he is engaged, as he states, in agricultural pursuits. However favorably this case may thus, in one aspect of it, have been presented, there is a different aspect in which it ought also to be considered. The crisis is one of impending or threatened, if not of actual hostilities, in which different sections of the country are, or may soon be, arrayed in arms against each other. Mitigating circumstances, which might induce the pardon of an act of treason, cannot so qualify the offence as to alter its legal definition. That a person who has participated in a treasonable aggression upon a fortress of

the United States should, at such a period as this, pass and re-pass the frontier of the seceded States without being justly liable to the most vigilant suspicion, cannot be supposed possible. The reasons are obvious. Should he, for example, transmit intelligence to Georgia concerning military preparations here, or take part, however indirectly, in procuring supplies or other assistance for those in arms against the United States, he would commit an act of treason for which he would be triable here. Those who stand in his relation to two hostile sections of a country are, unfortunately, the persons most frequently concerned in such criminal enterprises. In their punishment, public policy may sometimes require a severity sadly disproportionate to the actual measure of guilt in their intentions. I have, therefore, during the two days of the hearing, considered carefully the question whether it would be my duty, if the courts of the United States for Georgia were open, to commit him under the charge of treason, and issue a warrant for his removal thither for trial. If this question is answered affirmatively, he should not be discharged without giving cautionary security under the act of 1798. I have heard his counsel fully upon this point. But I have declined hearing the District Attorney upon it, because I have no doubt whatever that sufficient probable cause to support a prosecution for treason has been shown.

Any such aggravated breach of the *duty of allegiance* to an *existing* government as may tend to its total or partial subversion is, in a general sense, within the political definition of treason. Under the government of the United States, the legal catalogue of specific offences embraced in this definition is, however, limited by the constitutional provision that "treason against the United States shall consist *only* in levying war against them, or in adhering to their enemies, giving them aid and comfort." Under other governments, including that of England, the catalogue of treasons is more extended. But the two species of treason mentioned in the Constitution are described in it in language borrowed from that of the English statute of treasons. The phrase "levying war," as used in the Con-

stitution, is therefore understood and applied in the United States in the same sense in which it had been used in England. Chief Justice Marshall consulted Coke, and Hale, and Foster, in order to ascertain the constitutional meaning of this phrase. (2 Burr's Tr. 402, 409; 4 Cranch, 471, 472, 477.) According to these writers, the occupation of a fortress by a body of men in military array, in order to detain it against a government to which allegiance is due, is treason on the part of all concerned, either in the occupation or in the detention of the post.

The words of Sir E. Coke are: "If any, with strength and weapons invasive and defensive, doth hold and defend a castle or fort against the king and his power, this is levying of war against the king." (3 Inst. 10.) Sir M. Hale has copied this language almost precisely. (1 Pl. Cor. 146.) Sir M. Foster says: "Holding a castle or fort against the king or his forces, if actual force be used in order to keep possession, is levying war. But a bare detainer, as, suppose, by shutting the gates against the king or his forces, without any other force from within, Lord Hale conceiveth will not amount to treason. But, if this be done in confederacy with enemies or rebels, that circumstance will make it treason, in the one case under the clause of adhering to the king's enemies—in the other, under that of levying war." (Disc. 1, ch. II, s. 11.) In the year 1776, the powers of government under the British East India Company were vested, at Fort St. George, in the President and Council of Madras. Neither the President nor the Council could rightfully administer the local government independently of one another. The President adopted certain arbitrary and illegal measures for suspending a majority of the Council from participation in its proceedings. They, in turn, assuming the administration of the government, deposed and imprisoned him, and took and detained possession of the fort. As their intent, in this usurpation of power, was only to substitute themselves for the regular local government, and exercise its functions in subordination to the East India Company, they were convicted of a misdemeanor only. But the Court of King's Bench were of opinion that "if the assumption of the govern-

ment, and taking possession of the fort, had been with an intent to *draw it from the dominion of* the crown of Great Britain, it would have been high treason." (21 St. Tr. 1283; see 3 C. Rob. 31.)

The present case is much more simple. In the fort in question there was, in legal strictness, no more division of power, or deduction from the jurisdiction of the United States, than there is in the District of Columbia. (6 Wheaton, 426, 427; 12 Peters, 619.) The jurisdiction of the United States was, under the Constitution, as exclusive and independent of state control as if the land on which the fort was erected, and which had been ceded by the State of Georgia, had not been within her limits. If, indeed, the purpose of taking possession of it, as a defenceless post, had been to keep it for the United States, the act, whether excusable or not, would not have been treasonable. But the crisis was one of impending revolution or insurrection. The threat of revolutionary measures had already proceeded from the government of the State. The detention of this post for her government by this hostile force was, therefore, I think, levying war against the United States. If the treasonable intent had at first been legally doubtful, the subsequent unqualified surrender of the fortress to the State would, if the doubt were not removed by it, render the case a proper one, at all events, for the consideration of a jury.

That no hostile resistance was opposed by the former occupants of the fort is, I think, unimportant. When a body, large or small, of armed men is mustered in military array for a treasonable purpose, every step which any one of them takes in part execution of this purpose is an overt act of levying war. This is true, though not a warlike blow may have been struck. The marching of such a corps with such a purpose, in the direction in which such a blow might be struck, is levying war upon land. The mere cruising of an armed vessel with a hostile purpose is levying maritime war, though the cruiser may not encounter a single vessel. This doctrine, which is conceded throughout the opinion of Chief Justice Marshall in Burr's Case, had been established previously by English authorities.

(1 Hale P. C. 152; Foster, 218; 2 Salk, 635; 13 How. St. Tr. 485; 2 Burr's Tr. 408; 4 Cranch, 476.)

The allegation that the accused was, or may have been, acting under the orders of the Governor of Georgia, or of some other commanding or superior officer, is likewise unimportant. In the cases of the Highlanders of Scotland, whose clans were, without any independent will of their own, mustered by their chiefs into the military service of Charles Edward when he invaded England in 1745, the legal character of such a defence was fully considered. The previous doctrine then recognized, and re-established, was that the fear of having houses burned, or goods spoiled, was no excuse, in the eye of the law, for joining and marching with rebels; that the only force which excuses on the ground of compulsion is force upon the person and present fear of death, which force and fear must continue during all the time of military service with the rebels, and that it is incumbent in such a case on every man who makes force his defence, to show an *actual* force, and that he quitted the service as soon as he could. (Foster, 14; 18 St. Tr. 391, and see Foster Disc. 1, ch. 2, s. 8.) If any other excuse were allowable, it would, in the language of Sir M. Foster, "be in the power of any leader in a rebellion to indemnify all his followers."

This doctrine is applicable wherever and so long as the duty of allegiance to an existing government remains unimpaired. When this fort was captured, the accused, in the language of the Supreme Court, owed "allegiance to two sovereigns," the United States and the State of Georgia. (See 14 How. 20.) The duty of allegiance to the United States was co-extensive with the Constitutional jurisdiction of their government, and was, to this extent, independent of, and paramount to, any duty of allegiance to the state. (6 Wheaton, 381, and 21 Howard, 517.) His duty of allegiance to the United States continued to be thus paramount so long, at least, as their government was able to maintain its peace through its own courts of justice in Georgia, and thus extend, there, to the citizen that protection which affords him security in his allegiance, and

is the foundation of his duty of allegiance.   Though the subsequent occurrences which have closed these courts in Georgia may have rendered the continuance of such protection within her limits impossible at this time, we know that a different state of things existed at the time of the hostile occupation of the fort.   The revolutionary secession of the State, though threatened, had not then been consummated.   This party's duty of allegiance to the United States, therefore, could not then be affected by any conflicting enforced allegiance to the State.   He could not then, as a citizen of Georgia, pretend to be a public enemy of the United States in any sense of the word "enemy," which distinguishes its legal meaning from that of traitor. Future cases may, perhaps, require the definition of more precise distinctions, and possible differences, under this head.   The present case is, in my opinion, one of no difficulty, so far as the question of probable cause for the prosecution is concerned.

The evidence for the prosecution has consisted of the direct testimony of one witness to the alleged overt act, and of admissions made voluntarily by the accused party since his arrest.   The Constitution provides that no person shall be *convicted* of treason unless on the testimony of two witnesses to the same overt act, or on confession in open court.   The admissions here proved were not such confessions, and upon the trial of an indictment, would not, in connection with the testimony of the single witness to the overt act, suffice to warrant a conviction.   But the provision of the Constitution, and the language of the first section of the act of April 30, 1790, on the subject, apply only to the trial of indictments, and are inapplicable to proceedings before grand juries, or to preliminary investigations like the present.

This appears to have been the opinion of Chief Justice Marshall (1 Burr's Tr. 196), and likewise of my judicial predecessor in this district.   (2 Wall Jr. 138.)   Judge Iredell had, indeed, been previously of a different opinion.   (1 Whart. St. Tr. 480.)   His impression had probably been derived from the opinions which, under the statutes 1 Ed. 6, c. 12, s. 22; 5

Ed. 6, c. 11, s. 11, and 7 W. 3, c. 3, had prevailed in England.
· (See Fenwick's Case, 13 St. Tr. 537, and 26 How. 731.)    As
the point has never been directly decided in the United States,
it may not be amiss to mention a difference between the lan-
guage of the English statutes and the words of the Constitution.
Those statutes enacted that no person should be *indicted* or con-
victed of treason, unless, etc.    The Constitution, omitting the
word "indicted," uses the single word "convicted."    This
difference in language, to which the attention of Chief Justice
Marshall was doubtless directed, though he does not mention
it, seems to be decisive of the question.    The intention of the
framers of the Constitution must have been to restrain the
application of the prescribed rule of evidence to the trial of the
indictment.    A person should not, however, be indicted or im-
prisoned under a charge of treason when there is no rational
probability that the charge, if true, can be proved by two wit-
nesses on the future trial.

In the present case, I require security of the peace and for
good behavior.

The above opinion having been read, the District Attorney
made a formal application to the effect of a suggestion which
he had made in his previous argument.    The suggestion had
been that, although the accused party could not be sent at this
time to Georgia for trial, he might be committed here for trial
in the proper Court of the United States for Georgia when it
should hereafter be open, and that he might, in the meantime,
be detained here in custody, or admitted to bail to answer the
charge hereafter in Georgia.    The formal application was a
motion that he be held to bail, or committed for trial, "at the
next *actual* term or session of the Circuit Court of the United
States for the Southern District of Georgia."    After the argu-
ment of this motion, the JUDGE retained his former opinion,
saying:

I cannot commit this party for trial under any other juris-
diction· than that conferred by the 33d Section of the act of
1789.    Under this act I can commit him to no other custody

than that of the marshal. I cannot, under the act, commit him to the marshal's custody for any purpose other than that of removal to Georgia. If it appeared probable that the proper court there would be open within a definite reasonable period, the necessity of the case might authorize a limited corresponding delay, either in the issuing, or the executing, of a warrant of removal; perhaps in executing it, rather than in issuing it. But no such probability appears. Most of the cases which have been cited as to putting off trials for criminal offences, and keeping prisoners under arrest, are precedents to regulate the practice of courts to which the prisoners are committed for trial, and not the practice of magistrates ordering the removal of prisoners to proper places for trial. The judiciary system of the United States is founded upon the Constitution. The warrant of removal must be issued *seasonably* under the judiciary act, with a view to a probable *speedy* trial under the Constitution, in the proper district. The District Attorney still declares that he does not wish that a warrant of removal be issued. The order of commitment, as he asks it, without such a warrant, would be a dangerous precedent. It would sanction the imprisonment, for indefinitely long periods, of persons at great distances from their homes and their friends, where bail might not be found. Under charges for capital offences bail might be refused as well at the time of commitment, as also afterwards on habeas corpus.

Though I have no doubt myself upon the point, yet as my refusal of the application will not be liable to revision, I am desirous of consulting on the subject with Judge Grier, who, I am confident, will, at my request, sit with me, and hear the District Attorney's arguments repeated.

Judge Grier, after having heard these arguments, remarked that his opinion coincided on all the points of the case, and particularly the point upon which it had been asked, with the District Judge's opinion, which he had previously read.

The District Judge then said: The decision upon this hearing, though Judge Grier kindly sits with me, must be ex-

clusively my own. His concurrence in my former opinion, to which I adhere, confirms me in a satisfactory belief of its correctness. The District Attorney's motion is not granted.

Mr. Greiner, upon entering with two sureties into a recognizance in $10,000 to keep the peace and be of good behavior in all cases arising under the Constitution and laws of the United States, was discharged from custody.